DS136610

SEALED

CLERK US DISTRICT COURT
NORTHERN DIST. OF TX
FILED

ORIGINAL

2022 FEB 18 AM 11:08

DEPUTY CLERK MS

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.* OMNI HEALTHCARE, INC.,<br><br>Plaintiffs,<br><br>v.<br><br>TENET HEALTHCARE CORP.; USPI HOLDING COMPANY, INC.; UNITED SURGICAL PARTNERS INTERNATIONAL, INC.; SURGCENTER DEVELOPMENT; INTRACOASTAL SURGERY CENTER, LLC; SURGICAL CENTER DEVELOPMENT #3, LLC; INTRACOASTAL SURGERY CENTER, LLC; STACEY BERNER, MD.; SURGICAL CENTER DEVELOPMENT, LLC; and JOHN DOES,<br><br>Defendants. | **Filed *In Camera* and Under Seal**<br><br>3-22CV0401-E<br><br>**DO NOT PUT ON PACER** |

## *QUI TAM* COMPLAINT

## INTRODUCTION

1. Relator brings this action on behalf of the United States of America under the Federal False Claims Act, 31 U.S.C. §§ 3729 *et seq.* ("FCA") and the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b ("AKS") in order to recover damages and civil penalties on behalf of the United States arising from false claims and fraudulent statements, records and claims made by Defendants. As explained in greater detail below, the allegations involve one of the largest developers of ambulatory surgery centers ("ASCs") in the country recruiting and rewarding doctors who can

refer the most patients, a strategy that makes the free-standing surgery centers quickly profitable and ready for sale to the highest bidder. It is a formula used to build hundreds of surgery centers across the country.

2. The FCA provides that any person who knowingly submits or causes to be submitted to the Government a false or fraudulent claim for payment or approval is liable for a civil penalty of 5,500 to $11,000 for each such claim submitted on or before November 2, 2015 and $10,781 to $21,563 for each such claim submitted after November 2, 2015, as well as three times the amount of the damages sustained by the Government. The FCA permits persons having information regarding a false or fraudulent claim against the Government to bring an action on behalf of the Government and to share in any recovery. The complaint must be filed under seal, without service on the defendants. The complaint remains under seal while the Government conducts an investigation of the complaint's allegations and determines whether to join the action.

3. Pursuant to the FCA, Relator seeks to recover on behalf of the United States damages and civil penalties arising from Defendants' violations of the FCA and AKS statutes and purposeful submission of false and/or fraudulent claims to the Government.

## JURISDICTION AND VENUE

1. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1367 and 31 U.S.C. § 3732.

2. This Court may exercise personal jurisdiction over Defendants pursuant to 31 U.S.C. §3732(a) because Defendants transact business in the Northern District of Texas.

3. Venue is proper in this District pursuant to 31 U.S.C. §3732(a) because

Defendants can be found in, reside in and/or have transacted business in the Northern District of Texas.

4. Relator knows of no other FCA complaints that have been filed against Defendants alleging the same or similar actions for the time period at issue. Additionally, Relators are original sources as defined in 31 U.S.C. § 3730(e)(4)(B). Relator made voluntary disclosures to the United States prior to the filing of this lawsuit.

**PARTIES**

5. The United States is the real parties of interest in this action.

6. Relator **Omni Healthcare, Inc. ("Relator" or "Omni")** is a multi-specialty physician group based in Brevard County, Florida. Relator operates in central Florida and specializes in the fields of internal medicine, surgery, pediatrics, family practice and many medical and sub-specialties. The facts alleged within are based on the personal observation of Relator Omni's principal and administrators, as well as documents and information in his possession. The information and observations led Relator to question Defendants' fraudulent actions.

7. Defendant **Tenet Healthcare Corporation ("Tenet"),** a Nevada corporation, is a diversified healthcare services company with headquarters in Dallas, Texas. It operates a care network that includes 65 hospitals and more than 550 other healthcare facilities including ambulatory surgery centers, urgent care centers, imaging centers, surgical hospitals, off-campus emergency departments and micro-hospitals. In 2020, it had net operating revenues of $17.6 billion.

8. Defendant **USPI Holding Company, Inc. ("USPI"),** a Delaware corporation

formed on March 20, 2015, is a subsidiary of Tenet Healthcare Corporation. USPI operates the ambulatory care segment of Tenet. At year-end 2020, USPI held an interest in 308 ambulatory surgery centers, 40 urgent care centers, 24 imaging centers and 24 surgical hospitals in 31 states. Tenet holds a 95 percent majority interest in USPI. The Tenet ambulatory care segment generated $2.1 billion in net operating revenues in 2020.

9. Defendant **United Surgical Partners International Inc. ("USP International")**, a Delaware corporation formed on February 27, 1998, is a subsidiary of USPI Holding Company. United Surgical Partners International acquired 137 ambulatory service centers from SurgCenter Development in 2020 and 2021 for approximately $2.3 billion. It also acquired an exclusive option to partner with the principals of SurgCenter Development on future ASC development projects.

10. Defendant **SurgCenter Development ("SCD")** was acquired by Tenet through its United Surgical Partners International Inc. subsidiary on December 22, 2021. Surgical Center Development Inc. is a Nevada corporation formed on February 6, 2002.

11. Defendant **Intracoastal Surgery Center LLC ("Intracoastal")** is a Florida limited liability corporation formed on October 4, 2019. Its largest single owner is listed in Florida health care records as Surgical Center Development LLC, which holds a 35 percent interest. The remainder is owned by physician partners. Intracoastal's manager is W. Christopher Urban, a managing partner and the chief development officer of SurgCenter Development.

12. Defendant **Surgical Center Development #3 LLC** is a limited liability company formed in Nevada on December 19, 2014. The principals of Surgical Center Development Inc. are listed as the company managers in state corporate records. It appoints a member to the board

of directors of Intracoastal Surgery Center LLC. Tenet acquired Surgical Center Development #3 in December 2022.

13. Defendant **Surgical Center Development #4 LLC** is a limited liability company formed in Nevada on May 13, 2019. The principals of Surgical Center Development Inc. are listed as the company managers in state corporate records. Tenet acquired Surgical Center Development #4 in December 2022.

14. Defendant **Stacey Berner, MD ("Berner")** is a principal, managing partner and Chief Executive Officer of SurgCenter Development. Berner served as a member of the board of directors of Intracoastal and accepted the ownership offering agreements of new members to Intracoastal.

15. Defendants **John Does** are 232 other centers around the United States, which were developed by SCD in the same manner as Intracoastal.

## REGULATORY OVERVIEW

### The Federal False Claims Act

16. The False Claims Act, 31 U.S.C. §§ 3729 *et seq.* reflects Congress' objective to "enhance the Government's ability to recover losses as a result of fraud against the Government." S. Rep. No. 99-345 at 1 (1986). As relevant to this case, the FCA establishes liability for an individual or entity that:

> (A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; or
>
> (B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim.

31 U.S.C. § 3729(a)(1).

17. The FCA defines "knowing" and "knowingly" to mean that a person with respect to information (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information. 31 U.S.C. § 3729(b)(1). No proof of specific intent to defraud is required and an innocent mistake is not a defense to an action under this act. *Id.*

18. In addition to treble damages, the FCA provides for the assessment of civil penalties for each violation.

**The Anti-Kickback Statute**

19. The Anti-Kickback Statute ("AKS"), 42 U.S.C. § 1320a-7b, makes it a criminal offense to "knowingly and willfully" offer, pay, solicit or receive any remuneration to induce referrals of items or services paid for by Government health care programs. Specifically, the AKS provides:

> (1) whoever knowingly and willfully solicits or receives any remuneration (including any kickback, bribe or rebate) directly or indirectly, overtly or covertly, in cash or in kind—
>
> (A) in return for referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program . . . .
>
> (B) in return for purchasing, leasing, ordering, or arranging for or recommending purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program;

> (2) whoever knowingly and willfully offers and pays any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person;
>
> (A) to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program . . . .
>
> (B) to purchase, lease, order, or arrange for or recommend purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program . . . . 42 U.S. C. § 1320a-7b(b).

20. Specific intent is not required to establish a violation of the AKS. 42 U.S.C. § 1320(a)-7b(h).

21. A "Federal health care program" is defined as any plan or program providing health benefits funded, whether directly or indirectly, by the United States Government. The AKS applies to funds received by Defendants from programs including Medicare, Medicaid, TRICARE and the Veterans Administration.

**Violations of the AKS Can Form the Basis of FCA Liability**

22. Congress has long viewed the elimination of kickbacks as central to any efforts to combat Medicare fraud and abuse. Courts have held that a person or entity that violates the AKS and subsequently submits a claim for payment or causes another to do so has violated the FCA, regardless of what form the claim or statement takes. Courts have reasoned that such claims are false because there is a false certification attached to them—either express or implied—as to compliance with the AKS each time a tainted claim is submitted.

## ALLEGATIONS

### Overview

23. The "template" used by one of the largest developers of ASCs in the country recruits and then rewards doctors who can refer the most patients, a strategy that makes the free-standing surgery centers quickly profitable and ready for sale to the highest bidder.

24. Principals and development officers of SurgCenter Development arrange financing, oversee land acquisition and construction, develop operating agreements and maintain seats on boards of directors that allow them to approve or deny any changes.

25. In its template development of an ASC in Brevard County, Florida, the center offered ownership interest to its "physician partners" based on the number of referrals the doctor could direct to the Intracoastal Surgery Center. Busier physicians with more referrals received approval to buy more ownership units.

26. An OB/GYN who could offer few referrals was allowed to buy one ownership unit, while a busy orthopedic surgeon with many referrals received approval to purchase eight.

27. A single unit at the Brevard County facility returned about $2,500 a month in distributions. In less than two years, the value of a unit at Intracoastal increased 33-fold, from $8,000 to $256,000 a unit, when a subsidiary of Tenet Healthcare Corporation negotiated to buy the portfolio containing the surgery center.

28. At Intracoastal, at least one physician who could not produce a large volume of patients or referrals was ousted. For example, the ASC stripped a disabled doctor of his investment. After a vote of its members, Intracoastal paid $64,000 – the original sales price – to repurchase his eight ownership units. At the time, the units were worth $256,000 each.

29. The federal Anti-Kickback Statute (42 U.S.C. § 1320a-7b) prohibits the exchange

or offer to exchange anything of value in an effort to induce or reward the referral of business reimbursable by federal health care programs. It prohibits directly or indirectly offering or receiving anything of value in exchange for, or to induce referrals.

30. Physician-owners of certified ambulatory surgery centers can protect themselves from violating the AKS law by complying with each of the conditions of a federal "safe harbor." To comply with the safe harbor, the terms on which an investment is offered cannot be related to the expected volume or referrals, the services furnished or the amount of business generated by the investor.

31. SCD uses its template to develop at least 12 new surgery centers per year. On its website, the company boasts that it developed 232 ambulatory surgery centers across the United States. The centers range in size from 5,000 to 9,000 square feet, contain one to three operating rooms and require about nine months to build.

32. The company relied on a well-honed formula to develop facilities in more than two dozen states since the early 1990s. It is the same formula used at Intracoastal. SCD recruits physician-investors based on the patient referrals and patient volume they can generate, guaranteeing a predictable and rapid increase in revenue.

33. SCD acquires between 35 percent and 40 percent of each facility, assigns a "development officer" to lead the project and holds at least one seat on the board of directors. It governs the operation with standardized policies, procedures and membership and operating agreements it developed. Its physician partners as a group maintain a majority interest. However, SCD and its affiliates hold the largest single ownership interest of between 35 percent and 40 percent—policy and other changes require approval of 70 percent of the ownership units.

34. The ASC template used by SurgCenter Development across the country recruits

physician-members and apportions their investment based on the expected volume of services, referrals and the business they can generate.

35. Federal safe harbor regulations also require ASCs to disclose to patients the names of physicians who hold an ownership interest. Patients are required to acknowledge in writing that they have been informed. Intracoastal physicians said they were unaware of the requirement.

36. These recruiting and investment arrangements and the failure to disclose physician ownership breach the "safe harbor" and violate the federal Anti-Kickback statutes.

**Details of the Violations**

37. SCD recruits physician partners by providing what it calls a template for success. It explains on its website:

> We have developed numerous surgery centers. Chances are, this will be the first time you have participated as an investor-owner in an ASC. SurgCenter Development will provide the template for success and will work with you to customize the ASC to meet the needs of the partners and local market.

38. Typically, SCD explains, a 1 percent ownership sells for $9,000. In January 2022, a 5 percent ownership interest cost a physician member $45,000. SCD estimates the initial capitalization of a project at between $630,000 and $900,000.

39. The company outlines the ownership structure, the capital required and its role in these projects on its website. SCD helps members secure financing for equipment purchases and tenant improvement costs. It provides an estimate of the cost for start-up, working capital, equipment and contingency.

40. It cites the SurgCenter Advantage benefits to member physicians as expedited start-up time, architectural design experience, access to lower equipment and supply costs, access to capital, financing, licensing preparation and proficiency, streamlined operating systems

that are designed for physician efficiency, support with local hospital and doctor politics and policy and access to a national network of physician and ASC partners.

41. Their process, the company said, empowers surgeons developing ASCs across the country, in part, by targeting recruitment. Each of the centers SCD develops operate in accordance with SurgCenter's standard operating agreement, which the company said "has been successfully used in all of our projects."

SurgCenter explains:

- As a partner, we do not receive development or management fees.
- SurgCenter shares income with you and your local surgeon owners through monthly distributions that are allocated based on each partner's ownership interest in the ASC …
- Surgeons who become partners in your ASC will work with one of the principal owners of SurgCenter Development to design the structure of the group and facilities.
- The comprehensive resources and expertise of SurgCenter Development will be available to you, the Board of Managers, and the Nurse Administrator to ensure the ASC operates effectively and professionally.

42. The development company also "actively participates" on the company board of directors.

43. In SCD's development of Intracoastal, Defendant Berner, a principal and the Chief Executive Officer of SCD, and W. Chris Urban, a SCD principal and chief development officer, played active and instrumental roles.

44. Berner served on the board of directors and, acting as the company's authorized member, accepted the ownership offering agreements of new members. Urban, the chief development officer, was listed as Intracoastal's manager when the company was formed on February 8, 2018. Urban now is listed as the company manager on corporate records filed in Florida.

45. The Intracoastal Surgery Center initially was licensed by the Florida Agency for

Health Care Administration in February 2019. It is a 7,700-square-foot facility with two operating rooms and a "procedure room" designed to provide the tools needed for minimally invasive surgery.

46. Dr. Kyle Moyles, a hand surgeon and Intracoastal board member and investor, recruited Dr. Jeffrey Greenspoon, a well-known and busy orthopedic surgeon, to invest in the ASC in January 2020. The two physicians discussed in detail how much revenue and the number of patients Greenspoon could bring to the center.

47. Afterward, Moyles, who is a member of Intracoastal's board of directors, and one of its largest physician-owners, offered Greenspoon an opportunity to buy eight ownership units at $8,000 each. Greenspoon argued that Bryan Parry, a medical practice partner, also should be allowed to invest and purchase eight ownership units.

48. Parry became a member, but Intracoastal allowed him to purchase just one share because, as Greenspoon recalls, Parry could not generate enough revenue or provide enough referrals.

49. Greenspoon calls Moyles a "front man" for SCD, which through its ownership interest and position on the board of directors could push through or block new members and policies and procedures.

50. Intracoastal provided two other doctors, Andrew Zabinski and Mark Talbert, options to purchase ownership interests at $8,000 a unit in exchange for directing patients to the center. At the time, ownership units were selling for $44,000 each.

51. Both Zabinski and Talbert operate high volume medical practices, but were

prohibited from holding an ownership interest in the ASC by a non-compete agreement with Health First. SCD and the center constructed the arrangement with the two doctors to skirt the non-compete, capture referrals and reward the physicians.

52. Zabinski and Talbert now each hold a 5 percent interest in Intracoastal.

53. Intracoastal offered Dr. Victor Benezra, an OB/GYN, a similar arrangement as a way to circumvent his non-compete. He declined the offer. After his non-compete expired, Intracoastal allowed Benezra to purchase a single unit because, he was told, he could not provide a high volume of patients or referrals.

54. In 2020, Dr. Erin Mariano, an orthopedic surgeon employed by the relator, was invited by Kyle Moyles, MD to purchase shares in Intracoastal. Prior to determining the number of shares that she could purchase she was required to submit her expected productivity to Dr. Moyles. Based on her expected volume, she was permitted to purchase four shares.

55. On February 26, 2020, Kathryn Ball of SurgCenter Development welcomed Greenspoon to Intracoastal with a packet containing the center's operating agreement, articles of organization and a listing of current members.

56. Greenspoon paid $64,000 to purchase eight units, about a 7 percent ownership interest in Intracoastal.

57. The operating agreement with Intracoastal said the company developed "its ~~structure in a manner which it believes is lawful and does not constitute illegal remuneration~~ under the federal fraud and abuse statutes or otherwise."

58. The AKS prohibits the exchange or offer to exchange anything of value in an effort to induce or reward the referral of business reimbursable by federal health care programs.

59. Yet, discussion among the physician partners and the SCD staff that managed the

ASC focused on revenue – a term Greenspoon said was a euphemism for referral. Revenue, he explained, was a synonym for referrals.

60. Each week, Intracoastal and SCD tracked the number of patients, the doctors who referred the patients, the volume by physician and the insurers. Daily reconciliation reports tracked patient payments by doctor. By July 2021, Greenspoon was the most "productive" doctor by revenue.

61. Not surprisingly, the physicians selected to purchase the most units had some of the highest volumes.

62. For example, in the first six months of 2021:

| | | |
|---|---|---|
| Kyle Moyles | 12% | 31% |
| Jeffrey Greenspoon* | 7% | 6% |
| Mark Talbert | 5% | 14% |
| David Dominguez | 5% | 8% |
| Andrew Zabinski | 5% | 7% |

- Includes the time-period when Greenspoon initially was disabled.

63. In July 2021, Greenspoon was temporarily disabled after complications from knee surgery. Greenspoon planned on being a non-operating part-time, office-based orthopedic surgeon, a status he thought would not pose a threat or competitive issue to the ASC.

64. In August 2021, Intracoastal withheld his monthly distributions. On August 6, 2021, the Intracoastal administrator polled the member owners to determine whether to dissociate Greenspoon from the ASC.

65. In November 2021, the Intracoastal members voted Greenspoon out. The ASC operating agreement fashioned by SCD allows the company to dissociate a member from the ASC without cause. The agreement said:

> The determination, for any reason, with or without cause, by the Members holding at least seventy percent (70%) of the outstanding Units that the Member's interest shall be purchased by the Company.

66. It is impossible to dissociate a member without approval from SCD and its affiliates as they hold a 35 percent interest in Intracoastal.

67. After the dissociation, the company invoked another clause in the operating agreement to purchase Greenspoon's units. The payment provision said that upon dissociation:

> ... the Company shall purchase and the Member shall sell all of the Member's Unit(s). The purchase price shall be the lesser of (1) the book value of the Unit(s) as determined by the Company's accountants, or (2) the amount of capital paid for the Unit(s) when initially purchased from Company, or (3) in the event that any Units were acquired from another Member, the capital paid to the Company by the original Member owning such Unit(s).

68. Intracoastal paid $64,000 for the eight units – the original purchase price -- held by Greenspoon.

69. The dissociation and repurchase of his ownership interests came as subsidiaries of Tenet Healthcare negotiated a $1.2 billion purchase of 92 ASCs, including Intracoastal, and SurgCenter Development.

70. The deal increased the value of the ownership units to $256,000 each, according to Greenspoon. Four other ASC physician members said the company resold the Greenspoon units at $256,000 per share.

71. On November 8, 2021, the healthcare giant announced that its subsidiary, United Surgical Partners International, Inc., agreed to a $1.2 billion deal to acquire 92 ASCs, 16 of which were still under development, and SCD itself. Tenet also said it intended to spend $250 million to acquire a portion of the ownership interests held by the physician partners.

72. USP International pioneered a business model that connected surgical facilities with physicians and a management company. It began working with SCD in 2005. In 2020, USP International purchased 45 ASCs from SurgCenter Development for $1.1 billion. Ron

Rittenmeyer, Tenet's CEO, called the deal a "transformative transaction" as Tenet moved to expand its ambulatory platform.

73. Gregory George, the co-founder of SurgCenter, described the longstanding relationship between the companies:

> SCD is very pleased to complete this transaction with [USP International], marking another milestone in our longstanding relationship... The history between the companies made this transaction a natural evolution for many of our current physician partners and their facilities, enabling them to leverage the breadth and depth of both USPI and Tenet.
>
> We look forward to seeing the further growth and success of these partnerships, while we continue to focus on the development of additional de novo facilities.

74. Tenet expected its 2020 acquisition to generate double-digit returns within three years along with a 28 percent accretion to earnings per share in 2021. The deal cemented USP International's "partner of choice" reputation for ambulatory development. Tenet said:

> [USP International] has a long history of acquiring, integrating and successfully growing SCD centers together with premier physicians, which provides opportunities for continued expansion of these partnerships.

75. A year later, in December 2021, USP International finalized the $1.1 billion acquisition of SCD and its portfolio. In a presentation to investors, Tenet said the deal "continues to reposition the portfolio toward a higher-growth segment" and "solidifies leadership in musculoskeletal services and its shift to ambulatory."

76. The arrangement brought a "strong operating performance" in an attractive financial profile that promised a 38 percent margin. The acquisition of SugCenter Development and a five-year partnership agreement with its principals gives Tenet an "exclusive option" to invest in new centers.

77. Its acquisition of SCD, the company wrote:

Enhances the pipeline of new centers going forward Integrates SCD's development focus with USPI's management capabilities
Provides a competitive value proposition for two-way joint ventures

78. These exclusive development rights allow Tenet the option of participating in the early-stage investments in all new SugCenter Development centers and the option to buy-out the SurgCenter interest in each center 18 months after opening.

79. Greenspoon, Zabinski, Benezra and Mariano, all physician-members, said SCD directed operations and, because of its ownership interest, could veto any proposal, including the recruiting and acceptance of new physician members.

80. To add a new member, for example, required the applicant to comply with each provision contained in the operating agreement written by SCD and with the purchase and sales agreement. Intracoastal added the member only after members holding at least 70 percent of the outstanding ownership interests approved. The members included SCD and affiliates, which held at 35 percent interest.

81. Implementing or modifying company policies also requires the consent of members holding 70 percent or more of the ownership interests. The Intracoastal operating agreement includes a strict, non-compete clause with any ambulatory surgical center, hospital or operating site or room that provides any of the services offered within a 15-mile radius of the ASC.

82. The non-compete prohibits Intracoastal physician-members from being employed by a hospital system or another ASC.

83. When Intracoastal's physician members decided to open a second ASC in nearby Viera, the members waived the non-compete clause, but only allowed the busiest physicians to participate in the new development.

84. Intracoastal adopted the "template" SCD employs to develop the ASCs it packages and sells to Tenet and its subsidiaries for tens of millions of dollars each. Each ASC uses a standard operating agreement, ownership unit agreement and structure.

85. The development company's standard operating agreement states that it developed its structure in a manner that it believes is lawful and does not constitute illegal remuneration under federal fraud and abuse statutes.

86. Its website touts a proven SCD model "to facilitate the environment for success." A graphic depicts how the model brings five elements together to empower surgeons. One bubble shows an arrow hitting the bullseye on "targeted recruitment." A second features a dollar sign in a circle of "financial return."

87. As detailed with the development of Intracoastal, SCD targets physicians for membership who can generate patient referrals and provide volume. With ownership interests of 35 percent or more in each developing ASC, SCD and its affiliates control who receives an offer to buy shares and how many can be purchased.

88. It tracks revenue – a synonym for referrals and volume – by doctor, by day and by insurer. It makes distributions to members. And, it ousts those physicians who do not measure up. Its principals, in the case of Intracoastal the company president and chief development officer, have final say over every member recruited, policy, procedure and decision.

89. The model employed by SCD targets, recruits and then offers physicians ownership interests based on referrals and volume, all in violation of the AKS. The template has been undeniably profitable. The SCD model quickly develops and packages medical facilities generating margins of 38 percent or more for sale to the company's longstanding partners USP International and Tenet.

90. In the last two years alone, Tenet and its subsidiaries paid SCD $2.3 billion for their interests in 137 ambulatory service centers developed through this proprietary template.

91. On December 22, 2021, USP International bought SCD and then signed a five-year agreement with its principals to use their proprietary methodology to develop 50 more ASCs with Tenet as an early investor. The arrangement allows Tenet to purchase the facilities 18 months after opening.

## COUNT I

**Violations of the Federal False Claims Act Due to Violations of the Anti-Kickback Statute**

92. Relator incorporates paragraphs 1 through 91 of this Complaint as though fully set forth herein. This count sets forth claims for treble damages and civil penalties under the FCA.

93. As described in greater detail above, Defendants defrauded Government health care programs by conspiring to submit and/or causing the submission of false and/or fraudulent claims Defendants knew were tainted by violations of the Anti-Kickback Statute.

94. Under the FCA, Defendants have violated:

i. 31 U.S.C. § 3729(a)(1)(A) by knowingly presenting, or causing to be presented, a false or fraudulent claim for payment or approval;

ii. 31 U.S.C. § 3729(a)(1)(B) by knowingly making, using, or causing to be made or used, a false record or statement material to a false or fraudulent claim; and

iii. 31 U.S.C. § 3729(a)(1)(C) by conspiring to commit a violation of subsections (A) and/or (B).

95. Because of the false claims made by Defendants, the United States has

suffered and continues to suffer damages, and is therefore entitled to a recovery as provided by the FCA of an amount to be determined at trial, plus a civil penalty for each violation.

## PRAYER

WHEREFORE, Relator, on behalf of the United States, respectfully requests that:

a. This Court enter an order determining that Defendants violated the FCA by violating the AKS;

b. This Court enter an order requiring Defendants to pay treble damages and the maximum civil penalties allowable to be imposed for each false or fraudulent claim presented to the United States and/or treble damages and the maximum civil penalties allowable for Defendants violations of the AKS;

c. This Court enter an order requiring Defendants to pay all expenses and attorney's fees and costs associated with this action;

d. This Court enter an order paying Relator the maximum statutory award for its contributions to the prosecution of this action; and

e. Any and all other relief as this Court determines to be reasonable and just.

**PLAINTIFF/RELATOR DEMANDS A TRIAL BY JURY ON ALL COUNTS.**

Dated: February 18th, 2022.

Respectfully submitted,

*/s/ J.H. Trey Allen*
J.H. Trey Allen
trey@allennolte.com
Texas Bar No.: 00788798
Jennifer Nolte
jnolte@allennolte.com
Texas Bar No.: 24007755
Allen & Nolte, PLLC

5445 La Sierra Drive
Suite 350
Dallas, Texas 75231
Tel.: 214-521—2300
Fax: 214-452-5637

**Local Counsel for Relator**

Jesse Hoyer Estes
Florida Bar No.: 076934
jesse@hoyerlawgroup.com
Hoyer Law Group, PLLC
2801 W. Busch Blvd.
Suite 200
Tampa, Florida 33618
Tel.: 813-375-3700
Fax: 813-375-3710

**Lead Counsel for Relator**

3-22CV0401-E

JS 44 (Rev. 10/20) - TXND (10/20)

# CIVIL COVER SHEET

RECEIVED
FEB 18 2022
CLERK U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

**I. (a) PLAINTIFFS**
Omni Healthcare, Inc.

**DEFENDANTS**
Tenet Healthcare Corp. et al.

**(b)** County of Residence of First Listed Plaintiff ______
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant ______
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
J.H. Trey Allen, Allen & Nolte, Pllc, 5445 La Sierra Drive, Suite 350, Dallas, Texas 75231, 214-521-2300

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- [x] 1 U.S. Government Plaintiff
- [ ] 3 Federal Question *(U.S. Government Not a Party)*
- [ ] 2 U.S. Government Defendant
- [ ] 4 Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*
Click here for: Nature of Suit Code Descriptions.

**CONTRACT**
- [ ] 110 Insurance
- [ ] 120 Marine
- [ ] 130 Miller Act
- [ ] 140 Negotiable Instrument
- [ ] 150 Recovery of Overpayment & Enforcement of Judgment
- [ ] 151 Medicare Act
- [ ] 152 Recovery of Defaulted Student Loans (Excludes Veterans)
- [ ] 153 Recovery of Overpayment of Veteran's Benefits
- [ ] 160 Stockholders' Suits
- [ ] 190 Other Contract
- [ ] 195 Contract Product Liability
- [ ] 196 Franchise

**REAL PROPERTY**
- [ ] 210 Land Condemnation
- [ ] 220 Foreclosure
- [ ] 230 Rent Lease & Ejectment
- [ ] 240 Torts to Land
- [ ] 245 Tort Product Liability
- [ ] 290 All Other Real Property

**TORTS**

PERSONAL INJURY
- [ ] 310 Airplane
- [ ] 315 Airplane Product Liability
- [ ] 320 Assault, Libel & Slander
- [ ] 330 Federal Employers' Liability
- [ ] 340 Marine
- [ ] 345 Marine Product Liability
- [ ] 350 Motor Vehicle
- [ ] 355 Motor Vehicle Product Liability
- [ ] 360 Other Personal Injury
- [ ] 362 Personal Injury - Medical Malpractice

PERSONAL INJURY
- [ ] 365 Personal Injury - Product Liability
- [ ] 367 Health Care/ Pharmaceutical Personal Injury Product Liability
- [ ] 368 Asbestos Personal Injury Product Liability

PERSONAL PROPERTY
- [ ] 370 Other Fraud
- [ ] 371 Truth in Lending
- [ ] 380 Other Personal Property Damage
- [ ] 385 Property Damage Product Liability

**CIVIL RIGHTS**
- [ ] 440 Other Civil Rights
- [ ] 441 Voting
- [ ] 442 Employment
- [ ] 443 Housing/ Accommodations
- [ ] 445 Amer. w/Disabilities - Employment
- [ ] 446 Amer. w/Disabilities - Other
- [ ] 448 Education

**PRISONER PETITIONS**
Habeas Corpus:
- [ ] 463 Alien Detainee
- [ ] 510 Motions to Vacate Sentence
- [ ] 530 General
- [ ] 535 Death Penalty

Other:
- [ ] 540 Mandamus & Other
- [ ] 550 Civil Rights
- [ ] 555 Prison Condition
- [ ] 560 Civil Detainee - Conditions of Confinement

**FORFEITURE/PENALTY**
- [ ] 625 Drug Related Seizure of Property 21 USC 881
- [ ] 690 Other

**LABOR**
- [ ] 710 Fair Labor Standards Act
- [ ] 720 Labor/Management Relations
- [ ] 740 Railway Labor Act
- [ ] 751 Family and Medical Leave Act
- [ ] 790 Other Labor Litigation
- [ ] 791 Employee Retirement Income Security Act

**IMMIGRATION**
- [ ] 462 Naturalization Application
- [ ] 465 Other Immigration Actions

**BANKRUPTCY**
- [ ] 422 Appeal 28 USC 158
- [ ] 423 Withdrawal 28 USC 157

**PROPERTY RIGHTS**
- [ ] 820 Copyrights
- [ ] 830 Patent
- [ ] 835 Patent - Abbreviated New Drug Application
- [ ] 840 Trademark
- [ ] 880 Defend Trade Secrets Act of 2016

**SOCIAL SECURITY**
- [ ] 861 HIA (1395ff)
- [ ] 862 Black Lung (923)
- [ ] 863 DIWC/DIWW (405(g))
- [ ] 864 SSID Title XVI
- [ ] 865 RSI (405(g))

**FEDERAL TAX SUITS**
- [ ] 870 Taxes (U.S. Plaintiff or Defendant)
- [ ] 871 IRS—Third Party 26 USC 7609

**OTHER STATUTES**
- [ ] 375 False Claims Act
- [x] 376 Qui Tam (31 USC 3729(a))
- [ ] 400 State Reapportionment
- [ ] 410 Antitrust
- [ ] 430 Banks and Banking
- [ ] 450 Commerce
- [ ] 460 Deportation
- [ ] 470 Racketeer Influenced and Corrupt Organizations
- [ ] 480 Consumer Credit (15 USC 1681 or 1692)
- [ ] 485 Telephone Consumer Protection Act
- [ ] 490 Cable/Sat TV
- [ ] 850 Securities/Commodities/ Exchange
- [ ] 890 Other Statutory Actions
- [ ] 891 Agricultural Acts
- [ ] 893 Environmental Matters
- [ ] 895 Freedom of Information Act
- [ ] 896 Arbitration
- [ ] 899 Administrative Procedure Act/Review or Appeal of Agency Decision
- [ ] 950 Constitutionality of State Statutes

## V. ORIGIN *(Place an "X" in One Box Only)*

- [x] 1 Original Proceeding
- [ ] 2 Removed from State Court
- [ ] 3 Remanded from Appellate Court
- [ ] 4 Reinstated or Reopened
- [ ] 5 Transferred from Another District *(specify)*
- [ ] 6 Multidistrict Litigation - Transfer
- [ ] 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
31 U.S.C. 3729
Brief description of cause:
False Claims Act

## VII. REQUESTED IN COMPLAINT:

- [ ] CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND: ☐ Yes ☐ No

## VIII. RELATED CASE(S) IF ANY
*(See instructions):* JUDGE ______ DOCKET NUMBER ______

DATE
2/18/22

SIGNATURE OF ATTORNEY OF RECORD
s/ J.H. Trey Allen

**FOR OFFICE USE ONLY**

RECEIPT # ______ AMOUNT ______ APPLYING IFP ______ JUDGE ______ MAG. JUDGE ______